## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

SHAMEKA SCOTT                                                    PLAINTIFF

V.                              NO. 3:14CV91-BD

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                                   DEFENDANT

## ORDER

Oral argument hearing was held on March 19, 2015. Following a review of the record and arguments presented by counsel, the Court announced its findings of fact and conclusions of law, affirming the Commissioner's decision. Based on the record as a whole, there was sufficient evidence to support the decision that Ms. Scott could perform a reduced range of light work, in spite of her severe and non-severe impairments.[1] An excerpted transcript of the Court's findings and conclusions is attached.

Accordingly, the Complaint is hereby dismissed, with prejudice.

So ordered, this 30th day of March, 2015.

_____
UNITED STATES MAGISTRATE JUDGE

---

[1] The Court considered whether the Commissioner erred in finding that Ms. Scott could perform a reduced range of light work. The one reference to sedentary work at page four of the transcript was an unintended misstatement.

1

1            IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
2                    JONESBORO DIVISION

3

4   SHAMEKA SCOTT,                    .
                                      . Docket No. 3:14-CV-00091-BD
5   PLAINTIFF,                        .
                                      . Little Rock, Arkansas
6   VS.                               . March 19, 2015
                                      . 9:57 A.M.
7   SOCIAL SECURITY ADMINISTRATION,.
                                      .
8   DEFENDANT.                        .
    . . . . . . . . . . . . . . .     .
9

10

11                        TRANSCRIPT OF

12      EXCERPTED ORAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

13            IN ORAL ARGUMENT HEARING BY TELEPHONE

14             BEFORE THE HONORABLE BETH DEERE

15             UNITED STATES MAGISTRATE JUDGE

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Suzy Flippen

19

20  Transcription Service:            Robin Warbritton
                                      Post Office Box 262
21                                    Vilonia, AR  72173
                                      (501) 796-6560
22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1   APPEARANCES:

 2   For the Plaintiff:        Mr. Greg Wallace
                               Bartels Law Firm
 3                             Post Office Box 1640
                               Jonesboro, AR  72403-1640
 4

 5   For the Defendant:        Mr. Eric B. Tucker
                               Social Security Administration
 6                             Office of the General Counsel
                               1301 Young Street
 7                             Suite A702
                               Dallas, TX  75202-5433
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          P R O C E E D I N G S

2       (Call to order of the Court.)

3                      * * *

4          THE COURT:  All right.  I have spent considerable

5   time on the medical records in this case because they are

6   pretty extensive.  And I think that I probably know more about

7   the case right now than I will at any other time, so I'm

8   prepared to make findings of fact and conclusion -- and reach

9   conclusions, applying the law to the facts at this time.

10         And what I will do is -- we're still trying to figure

11  out the procedure, the most efficient procedure for doing

12  this.  What I will do is, is make those findings and reach

13  those conclusions orally here on the record.  We will have

14  that transcribed.  And in a week or so, I will docket that as

15  an order with the transcript attached, along with a judgment.

16         So, here are my findings in the case of *Shameka*

17  *Nicole Scott v. Carolyn Colvin*, *Acting Commissioner of the*

18  *Social Security Administration*, case number 3:14-CV-91 here in

19  the Eastern District of Arkansas.

20         I find that jurisdiction is proper.  Ms. Scott has

21  cleared all procedural hurdles.  She filed for disability and

22  SSI benefits November 7th, 2011, alleging an onset date of

23  August of 2011.  Her applications were denied initially and

24  upon reconsideration.  She asked for a hearing.  She actually

25  had two hearings; one on February 22nd, one on May 10th, 2013,

1 before an Administrative Law Judge.  A vocational expert

2 appeared at the second hearing because she alleged not only

3 physical impairments, but also depression, which would be an

4 non-exertional impairment.

5 　　　　　On June 13th, 2013, the ALJ issued an unfavorable

6 decision.  The appeals counsel denied her request for review.

7 　　　　　Ms. Scott then filed this appeal on April 14, 2014.

8 And on April 17th of 2014, the parties consented to the

9 jurisdiction of this Court.

10 　　　　　Ms. Scott, I believe, was 27 years old at the time of

11 her hearings.  She lived with her three children, who were all

12 minors; a one year old, I think a seven year old, and a nine

13 year old.

14 　　　　　The standard in this appeal is whether there's legal

15 error and whether there's substantial evidence to support the

16 Commissioner's finding that Ms. Scott had the residual

17 functional capacity to perform a reduced range of sedentary

18 work in spite of her severe impairments.

19 　　　　　The ALJ, at step two, found that Ms. Scott had

20 several severe impairments; diabetes, diabetic neuropathy,

21 carpal tunnel syndrome, hypertension, and depression.

22 　　　　　In her brief, Ms. Scott alleges that the ALJ erred in

23 not finding her back pain to be a severe impairment.  But

24 that, of course, is not reversible error because Ms. Scott

25 cleared the step two hurdle, in that the ALJ did find other

1  severe impairments and did state in his opinion that he

2  considered all impairments later in the analysis, including

3  non-severe impairments.  So that -- that point is not well

4  taken.

5          Her argument also is that the ALJ overestimated her

6  residual functional capacity because the -- after finding that

7  her carpal tunnel syndrome was a severe impairment, the

8  argument is that there were no restrictions in the residual

9  functional capacity finding to account for her carpal tunnel

10  syndrome.

11          She also argues that her diabetic neuropathy was not

12  adequately considered in the ALJ's finding that she could do a

13  reduced range of light work because light work includes a -- a

14  significant amount of walking that would be precluded by her

15  diabetic neuropathy.  Those are her arguments.

16          Many of the -- the medical records in this case are

17  rather voluminous, almost running to 900 pages.  Many of the

18  records predate her alleged onset date of August 30, 2011.

19  And that includes her diagnosis of carpal tunnel syndrome,

20  that I believe was made maybe some time in 2008.  Records

21  indicate that at the -- at the end of 2009, in December of

22  2009, the doctor that she saw for carpal tunnel syndrome

23  indicated or prescribed conservative therapy with wrist braces

24  and pain for the -- for the carpal tunnel syndrome and

25  indicated that if that was not sufficient, he would refer her

6

1  for surgical evaluation.  There is no indication that she was

2  ever referred for a nerve conduction study to confirm the

3  carpal tunnel -- carpal tunnel syndrome diagnosis or -- or

4  that she ever had such tests.

5        Nonetheless, the ALJ did find it to be a severe

6  impairment, which, of course, by definition, means that it had

7  more than a minimal effect on her ability to perform work

8  activities.

9        When I reviewed the medical records from the time of

10  her alleged onset date, which would have been August of 2011

11  -- again, there are many, many medical records.  For example,

12  and I will run through some of these, many of the records

13  don't relate to -- to her alleged impairments, but many also

14  do.  Her primary problem, from reviewing the records, appears

15  to be her uncontrolled diabetes.

16        In other words, her blood sugar levels remain high

17  throughout the relevant period, beginning in August of 2011

18  when she went to the doctor for back pain and reported a

19  history of carpal tunnel syndrome and elevated blood sugar

20  levels.  But even as early of August of 2011, the doctor in

21  that -- at that visit, noted her poor compliance, and

22  attributed her back problems to be conditioning and muscle

23  strain, and encouraged her to exercise.  He also noted that

24  she didn't keep appointments relating to colposcopy, which is

25  a procedure unrelated to any of her alleged impairments.

1    She was also evaluated for physical therapy, didn't

2  keep that appointment allegedly because she didn't have the

3  money.  But the evidence is -- is unclear about her financial

4  -- whether finances actually kept her from complying with

5  medical treatment.

6    November, she was back at the ER for blood sugar

7  issues.  She was told to follow up with her primary care

8  physician, but there is no evidence that she did.

9    She returned to the doctor in December of 20 -- the

10  end of December of 2011.  I say returned to the doctor, she

11  returned to the Emergency Room, again for elevated blood

12  sugar, but she had not ever seen her primary care physician.

13    On December 29th of 2011, she did see her primary

14  care doctor, but admitted that she had been off insulin

15  September -- since September of that year.

16    Again, I'll discuss later about her allegation that

17  she didn't comply with taking medications because of lack of

18  financial resources.

19    February of 2012, two months later, she went to her

20  primary care doctor for back pain, but her primary care doctor

21  noted that she was not taking medications for carpal tunnel

22  syndrome because it made her drowsy, and he advised her to

23  avoid sitting for long periods and to do more stretching.

24    She goes back a month later, in March of 2012, again

25  with allegations of back pain and uncontrolled blood sugar.

1   Again the next month, April of 2012, again for back pain and

2   blood sugar level.

3           She goes back in May, the next month, back to her

4   primary care doctor, who noted that she had multiple vague

5   complaints but no real abnormalities on physical examination.

6   The doctor -- oh, Ms. -- I guess Ms. Scott herself noted that

7   she was not physically active and that most of her -- the

8   doctor noted that most of the problems were due to poorly

9   controlled diabetes.

10          She went back to the doctor two months later, again

11  with back pain.  There was a speculation it might be a

12  ruptured ovarian cyst, but apparently that was not the case,

13  because when she went for an ultrasound, that diagnosis was

14  rejected.

15          She went back for what was possibly a toenail fungus

16  later that month, and at that appointment admitted that she

17  did not follow a diet as recommended and did not take her

18  medications as prescribed.

19          She went -- returned to the doctor in November of

20  2012, again with elevated blood sugar, complaining of

21  depression, nausea, and pain.  She was given an

22  antidepressant.

23          Returned a couple of weeks later complaining of pain,

24  headaches, nausea, neuropathy, pain in her toe, and

25  depression.

1     Returned the next month to the ER, where she was
2  diagnosed with a virus.  Later that month, she went to her
3  primary care doctor with allegations of shoulder pain,
4  insomnia, shortness of breath.  The doctor diagnosed
5  uncontrolled diabetes, bursitis, and depression.
6     The next month, she did see a counselor for the
7  depression, was given a Global Assessment Functioning Score of
8  40, which is actually quite low.
9     She went back the next week, February of 2013, to the
10 ER, alleging weakness, shoulder plain [sic] -- shoulder pain,
11 and with elevated blood sugar levels.
12    She returned to the doctor April 1st, alleging back
13 and shoulder pain.  Went to her primary care doctor.  Admitted
14 not going to physical therapy as prescribed.
15    She was back at the ER in April of 2013, alleging hip
16 pain and again uncontrolled blood sugar.  The doctor, however,
17 noted in the ER that she was -- did not appear to be acutely
18 ill.  I think that's when she had pancreatitis.  When she
19 returned to her primary care doctor, admitted not taking her
20 medications appropriately.
21    So, I guess I've gone through this to illustrate she
22 has a consistent history of noncompliance taking her
23 medications, attending therapy, attending counseling.  She is
24 noncompliant with the diabetic diet.  She doesn't follow
25 exercise recommendations.  And the medical records actually

1  are replete with examples of this.

2          Her reason for not taking her medications, for not

3  following up with other recommended courses of treatment, is a

4  lack of money.  But the record also shows that she, at least

5  for many, many periods of time, is on Medicaid, and which

6  dispels the notion that money kept her from getting her

7  insulin or other medications that were prescribed.  And, in

8  fact, there is nothing in the record to show that she was ever

9  refused treatment because of a lack of money.  And many, if

10 not most, of these records are from AHEC, which is a clinic

11 that is particularly for people with limited financial means.

12          So, there is really not sufficient evidence to find

13 that a lack of funds can account for her -- for her

14 noncompliance.  And, in fact, on one of her hospital visits,

15 the doctor noted that she was having family members bring in

16 food that was not on the diabetic diet that she was supposed

17 to be on.

18          So, the issue here is, really comes down to one of

19 credibility and whether the ALJ erred in discounting her

20 subjective complaints or subjective reports of her limitations

21 and her pain.  And so, the ALJ did credit her subjection

22 allegations and included -- included some restrictions in her

23 residual functional capacity to account for her subjective

24 allegations.  And, in fact, gave little weight to the

25 reviewing doctors based on Ms. Scott's testimony of her

1  subjective complaints.

2        In addition, as I noted, the ALJ considered both her

3  severe and non-severe impairments when he limited her to a

4  reduced level of light work.

5        The question then is whether the ALJ gave sufficient

6  reason for discounting the severity of Ms. Scott's complaints.

7  And I find that he did.  He gave good reasons for discounting

8  her subjective complaints.  First, the lack of objective

9  medical evidence.  And while this alone is not enough to

10 discount subjective complaints, there -- there was never -- as

11 noted, there was never a nerve conduction study to establish

12 the severity of her carpal tunnel syndrome, and that's --

13 that's just one example.  Many, many medical records

14 indicating mild or moderate evidence of -- to support her

15 subjective complaints.

16       In addition, the ALJ was -- properly considered her

17 lack of compliance in taking medications and abiding by her

18 diet.  Also, her activities of daily living.  And again,

19 that's not something that is dispositive, but it is relevant.

20 She had three minor children, although she did testify that

21 her sisters helped her with the one year old, but she also had

22 daughters, 7 and 9.  She took care of her own personal needs.

23       She testified she didn't do much housework, or if she

24 did housework that it -- that it made her extremely tired.

25 But she did pay her own bills, handled her own money.  She had

1  -- had achieved a GED certificate and had one year of college,

2  was able to get along with family and authority figures.  She

3  was able to drive and, in fact, owned her own car.

4          The ALJ also considered some inconsistent statements.

5  There is some inconsistency, in that one place in the record

6  she says that she never smoked, and another place where she

7  was a reformed former smoker, and testimony that she didn't

8  drink at all versus that she drank one beer a week.

9          I'm going to ignore that.  I mean, that's -- I don't

10 think that -- I don't think that that was a significant

11 inconsistency.

12          However, I do think there's an inconsistency in

13 blaming her noncompliance on a lack of funds, but regularly

14 using the services of AHEC, and the records that show that she

15 was on Medicaid for a significant period of time, and was

16 apparently on and off.  And there is no explanation.  I don't

17 know why she was on Medicaid at some times and off on others.

18          But, clearly, she was on Medicaid for some good

19 portion of the time.  So, it's -- it's inconsistent to say

20 that that's the reason she didn't take her insulin as

21 prescribed.

22          So, all of these are legally sufficient reasons for

23 discounting Ms. Scott's subjective complaints of her symptoms.

24 And certainly, there is evidence supporting the plaintiff's

25 position, including the carpal tunnel syndrome and the -- the

1  lack of specific restrictions for that, and yet, the -- the

2  limit to a reduced range of light work was a consideration of

3  the carpal tunnel, in that there were lifting restrictions and

4  postural limits included in the residual functional capacity.

5         I'm not allowed to reverse because there's evidence

6  that would support the plaintiff's position.  I'm obligated to

7  affirm the Commissioner if there is substantial evidence

8  viewing the record as a whole.  And here, the Commissioner's

9  decision to deny Ms. Scott benefits is supported by more than

10 substantial evidence when you look at the record as a whole.

11 The Commissioner considered all of Ms. Scott's impairments,

12 both severe as -- and non-severe, and I find that the ALJ

13 committed no legal error that could justify reversal.

14        And those complete my findings and conclusions.

15        And again, I will have those transcribed and appended

16 to my order and a judgment to reflect that decision.

17        Is there anything further, Mr. Wallace?

18        MR. WALLACE:   No, Your Honor.  Thank you.

19        THE COURT:  Yes.  Well, thank you.  Again, you've

20 done an excellent job for your client.

21        And, Mr. Tucker, thank you, as well.

22        And we're off the record.

23        MR. TUCKER:  Thank you, Your Honor.

24        MR. WALLACE:  Thank you.

25     (Adjournment at 10:43 a.m.)

14

ELECTRONIC SOUND RECORDING CERTIFICATION:

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/Robin Warbritton                    March 25, 2015
Signature of Approved Transcriber      Date


Robin Warbritton
Typed or Printed Name